LAURENTIDE CO., Limited, v. DUREY, Collector of Internal Revenue.

SAME v. IRWIN, Collector of Internal Revenue.

(District Court, N. D. New York. March 13, 1916.)

Nos. 13, 18.

INTERNAL REVENUE ⊜⊃9—REVENUE AND INCOME TAX—LIABILITY OF FOREIGN CORPORATION—"DOING BUSINESS"—"ENGAGED IN BUSINESS"—"TRANSACTING BUSINESS."

Under Revenue Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, § 6300), taxing the net income of foreign corporations engaged in business in the United States, and under Income Tax Law Oct. 3, 1913, c. 16, § 2, A, subd. 1, and G(a), 38 Stat. 166, 172, taxing such income of such corporations accruing from business transacted and capital invested within the United States, where a Canadian corporation, making newspaper paper, sent agents into the United States to solicit purchasers for its product, paying their expenses, hiring desk room in the United States, empowering the salesmen to make written contracts, in part in the United States, subject to the corporation's approval in Canada, and, when approved, to deliver the contracts, paying rent, storage charges on paper shipped into the United States, and also for work done by checks drawn on a bank in the United States where the company kept its funds received for goods delivered in the United States to purchasers, and then, to perform its written contracts, shipped paper consigned to itself in the United States to different points, where it hired storage rooms, and had the paper delivered to itself at such rooms, where it stored it in its own name and at its own risk pending delivery, doing so for its own convenience and to insure delivery according to contract, also shipping into the United States and storing in such manner paper to meet anticipated demands, such Canadian company "did business" in the United States, and "engaged in business"

---

⊜⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

therein, and also "transacted business" in the United States, so that it was liable to taxation under both acts.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Doing Business; Engage; Transacting Business.]

At Law. Actions by the Laurentide Company, Limited, against Cyrus Durey and against Roscoe Irwin, as Collectors of Internal Revenue. Judgment in each case directed, dismissing the complaint on the merits.

Actions tried before the court without a jury. No. 13 is an action to recover the sum of $1,572.91, amount of special excise tax assessed against the complainant, Laurentide Company, Limited, a foreign corporation, for the year 1911, under the United States Revenue Act of August 5, 1909, and paid under protest. No. 18 is an action to recover the sums of $955.71 and $1,959.59, amount of tax assessed against said Laurentide Company, Limited, said foreign corporation, for the years 1912 and 1913, assessed under said Act August 5, 1909, and under Income Tax Law Oct. 3, 1913, § 2, and paid under protest.

Louis M. Brown, of Glens Falls, N. Y. (Frederick W. Cameron, of Albany, N. Y., of counsel), for complainant.

Dennis B. Lucey, U. S. Atty., of Ogdensburg, N. Y., and Frank J. Cregg, Asst. U. S. Atty., of Syracuse, N. Y., for defendants.

RAY, District Judge. The assessment of the taxes above referred to and their payment to the collectors above named under protest is not in question. Complainant took all preliminary steps essential to the commencement of the actions. The question is: Were such taxes legally assessed and properly paid under and on the returns made and facts shown, or, to put the question another way, was the complainant, on the returns made and facts shown, exempt from the assessment and payment of the taxes mentioned on the ground it was a foreign corporation and was not doing business in the United States within the meaning of the laws referred to?

Section 38 of the Act of 1909, "An act to provide revenue, equalize duties and encourage the industries of the United States and for other purposes" (36 Stat. pt. 1, pp. 112, 113) provides:

"That every corporation * * * organized for profit and having a capital stock represented by shares, * * * now or hereafter organized under the laws of any foreign country and engaged in business in any state or territory of the United States, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation, * * * equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations, * * * subject to the tax hereby imposed; or if organized under the laws of any foreign country, upon the amount of net income over and above five thousand dollars received by it from business transacted and capital invested within the United States and its territories, Alaska, and the District of Columbia during such year, exclusive," etc.

Then follows a provision for ascertaining such net income by making deductions from the gross income for operating expenses, etc., and losses, depreciation, etc. Special provision is made for the deduction of $5,000, and for a return or report by the corporation.

February 29, 1912, the Laurentide Company, Limited, verified and filed with the collector its return of annual net income for the year 1911, giving its location, etc., and paid-up capital stock at $7,200,000, "no capital invested in United States of A.," and bonded indebtedness as $1,200,000. This return gave its "gross income" as $162,291, its net income as $162,291, made no claim to deductions except the "specific deduction from net income allowed by law, $5,000," which was deducted, leaving $157,291 as subject to the said tax. In this return no claim was made that the corporation was not doing business in the United States.

The return for 1912 showed "gross income $725,238.93," deductions for maintenance and operation of the business $605,329.30, and for losses $19,348.37, "net income $100,561.26," and specific deduction from net income allowed by law $5,000; leaving, says the return, "amount on which tax at 1 per centum is to be calculated for assessment $95,561.26," and on this sum the tax was assessed.

The return for 1913 gave gross income as $929,629.12, deductions for operating expenses $733,669.22, total deductions, same $733,-669.22, and "net income on which tax at 1 per centum is calculated," and on which it was calculated $195,959.90.

These last two returns had written on the margin thereof "This company is not doing business in the United States and this return is given under protest." The collector held adversely to this clause.

Chapter 16, Laws of U. S. (Act of Oct. 3, 1913), 38 St., being an act "to reduce tariff duties and to provide revenue for the government, and for other purposes," section 2, provides (A, subd. 1, and G [a, b]):

"That there shall be levied, assessed, collected and paid annually upon the entire net income arising or accruing from all sources * * * a tax of 1 per centum per annum upon such income * * * and a like tax shall be assessed, levied, collected, and paid annually upon the entire net income from all property owned and of every business, trade, or profession carried on in the United States by persons residing elsewhere."

"G (a) That the normal tax hereinbefore imposed upon individuals likewise shall be levied, assessed and paid annually upon the entire net income arising or accruing from all sources during the preceding calendar year to every corporation * * * organized in the United States, no matter how created or organized, not including partnerships; but if organized, authorized, or existing under the laws of any foreign country, then upon the amount of net income accruing from business transacted and capital invested within the United States during such year. * * * (b) Provided."

Here follows a provision for deductions. The question presented is: Did the Laurentide Company, Limited, have "a net income from business transacted (by it) and capital invested within the United States during such year," the year for which return was made (under protest) and the tax was imposed?

There is no claim it had capital invested in the United States, but it is insisted that during each of the years mentioned, 1911, 1912, and

231 F.—15

1913, it transacted business in the United States and derived the net income shown by the returns.

The facts proved by abundant evidence are as follows:

(1) The plaintiff was and is a foreign corporation organized and existing under the laws of the Dominion of Canada.

(2) It was and is engaged in the manufacture and sale of paper used by printers and newspaper concerns in printing newspapers.

(3) Its manufacturing plant and home office was and is at Grandmere, Quebec, Dominion of Canada.

(4) It, for a time in 1911, had desk room in New York City occupied by a stenographer and employé of the corporation, and, in 1912, rented a room and opened up an office in the city of New York, N. Y., where it by its agent and representative did business of and for the corporation in selling paper during the rest of 1912 and during 1913.

(5) It had one, and sometimes two, traveling salesmen in the United States, headquarters in New York at such room, who traveled and solicited business and contracts for the supply and purchase of paper manufactured by it in Canada. The corporation owned the office furniture.

(6) These traveling salesmen or agents had power to solicit contracts in the United States and agree upon terms, except price of goods, and insert same in printed form contracts, ascertain from the home office in Canada by telephone the price they could fix, have such contract signed by the purchaser or contracting party in the United States, and then forward same by mail to the home office of the company in Canada for acceptance or approval and signature by one of its executive officers, and return to such salesman or agent for delivery to the customer in the United States, who then delivered same. The contract was not to be binding on the corporation "unless signed by one of its executive officers at Grandmere, P. Q."

(7) These contracts were not for the manufacture of the paper and sale and delivery of same, but simply for the sale thereof, that is, as stated in the contract:

"The paper company agrees to sell and the purchaser agrees to purchase ——— entire requirements of newspaper used in the publication of (name of newspaper designated) a newspaper published in the city of ——— ——— tons of paper per ——— during (time fixed) according to terms and conditions as set forth as follows:" (Then followed terms as to delivery, etc.).

(8) After such contracts were made, the Laurentide Company consulted its own convenience in providing for delivery according to the terms of the contract, and shipped the paper consigned to itself in such quantities as it saw fit, provided the quantity was sufficient to fulfill the contract as to delivery, from time to time as demanded, to a point in the town or city where the purchaser under the contract carried on his or its business of printing and publication, selected by itself, and to some storehouse selected by it, where the paper was kept or stored until required for actual delivery to the purchaser. The paper was shipped at the expense and risk of the said corporation and stored at its own risk, and such corporation, the seller, also paid

the warehouse or storage charges. The corporation had a standing contract with a cartage company in New York City to deliver paper stored for it when called for by customers. It had contracts with warehousemen to deliver the goods in storage when properly called for by the purchasers as customers. The corporation also kept on hand, usually in New York, paper to supply extra demands for paper. In fact, there was no delivery to the purchaser until called for by it under the contract, and then delivery was made from the storehouse or warehouse of the corporation in the town or city where the purchaser did its business. Insurance, if any, was paid by the corporation, and, in fact, the paper until actually delivered was held, stored, and owned by the said Laurentide corporation.

(9) The corporation also purchased supplies, etc., for its plant in Canada in the United States.

(10) The corporation had a bank account at a bank in Glens Falls, N. Y., where checks given in payment for paper were deposited for collection, and on which checks in payment for supplies purchased and of salesmen were drawn. Balances not required for current business were sent to the home office in Canada.

(11) Occasionally a customer from the United States would personally visit the home office and execute his contract, and occasionally a contract called for some deliveries f. o. b. on the cars at the plant in Canada. These were exceptional cases.

The question is: Was the Laurentide Company, Limited, "engaged in business in any state or territory of the United States" so as to make it liable for a special excise tax "with respect to the carrying on or doing business by such corporation"? This tax, under the act of 1909, is to be assessed and paid "upon the amount of net income over and above five thousand dollars received by it (such foreign corporation) from business transacted and capital invested within the United States * * * during such year." Under the act of October 3, 1913, as to a foreign corporation, the tax is assessed and paid "upon the amount of net income accruing from business transacted and capital invested within the United States during such year." Hence the question is: Was "business transacted" by such corporation during the year mentioned within the meaning of the law?

In the one case, we have "engaged in business" within the United States, and, in the other, "business transacted" within the United States.

When the Laurentide Company employed and sent its agents clothed with power, even though limited, into the United States to travel about and solicit customers or purchasers for its manufactured product, and paid their expenses, and hired and paid for a place of business in the United States even though but desk room, and empowered such salesmen to make written contracts in part in the United States subject to its approval in Canada and when approved deliver them and did so ratify and have such contracts delivered, paid rent, storage charges, and other expenses, and also for the work so done by checks drawn on a bank in the United States where it kept, even temporarily, its funds received for goods delivered in the United States to purchasers, and then, to carry out and perform its written

contracts so made, and which in nearly all cases were to be performed in 'the United States, as to delivery of goods and in part as to making payments therefor, shipped such goods consigned to itself into the United States to different points, where it hired and paid for storage or warehouse room and had them delivered to itself at such rooms where it stored them for itself in its own name and at its own risk pending delivery to the customer, and did this for its own convenience and to insure delivery according to contract, and also shipped into the United States and stored in like manner goods to meet anticipated demands, it "did business" in the United States and "engaged in business" in the United States, and also "transacted business" in the United States. These business transactions were commenced within the United States by soliciting contracts; the making of the contracts by signing was consummated in Canada in part, but the delivery thereof was made in the United States. The corporation sent its goods into the United States and stored them in its own name, retaining and having complete title. It delivered from its own rented warehouses in the United States, and, when payment was made to it by check, it collected such checks in the United States and deposited the proceeds to its own credit in its own bank account in the United States and, as stated, paid all its liabilities incurred in the business done in the United States by checks drawn on such bank account, and therefore made payments completing the various transactions in the United States. True, some of the business connected with these transactions was done in Canada; for instance, the approval of the contracts and the shipping of paper into the United States, and the receipt and indorsement of checks received prior to actual deposit for collection. All the conditions of these 'contracts were not to be complied with in Canada. The most of them and the more important ones were to be performed in the United States. Here delivery was to be made, and here the contract was solicited, agreed upon, and signed by the purchaser. Here the Laurentide Company had its property with which to make deliveries in storage at its own expense in its own warehouses—those hired and paid for by it.

Appropriating the idea of Mr. Justice Peckham expressed in Pennsylvania L. M. F. I. Co. v. Meyer, 197 U S. at page 415, 25 Sup. Ct. 483, 49 L. Ed. 810, I think it would be somewhat difficult for the Laurentide Company, Limited, or its able attorney, to describe what it was doing in the United States, if it was not doing, carrying on, and transacting business therein when there receiving large quantities of newspaper consigned to itself and storing it, hiring and paying for storage room therefor, delivering it to customer's, purchasers thereof, soliciting contracts by agents for the purchase and supply of same, renting and paying rent for a room for doing the business, depositing and collecting the checks received in payment, and paying the expenses of the business therefrom, all done in the state of New York in the United States. It was not necessary that the contracts should have been made wholly in the United States (Pennsylvania L. Ins. Co. v. Meyer, 197 U. S. 407, 414, 25 Sup. Ct. 483, 49 L. Ed. 810), or that their execution or performance should

have been wholly in the United States (same case, cited and approved Equitable Life Society v. Pennsylvania, 238 U. S. 143, 147, 35 Sup. Ct. 829, 59 L. Ed. 1239, affirming 239 Pa. 288, 86 Atl. 787, and also by the Circuit Court of Appeals in this the second circuit, Geo. W. Bentley & Co. v. Chivers, 215 Fed. 959, 962). The mere act of sending salesmen into another state to sell sewing machines there, the orders being filled from the home office in another state and the contracts and cash collected being immediately remitted to agencies of the seller in other states, and the seller having neither office, store, nor managing salesmen in the state where such salesmen operated, has been held not to be doing business within such state so as to make the seller taxable on credits as provided by Rev. Code of Miss. 1880, § 497 (Singer Mfg. Co. v. Adams, 165 Fed. 877, 91 C. C. A. 461), although such seller was employed in trade or business within the state when it had "one or more local agencies in Mississippi in control of salesmen, selling sewing machines throughout a limited number of counties and reporting to such local agencies which in turn reported to a district agency in another state." That case is an authority in favor of the government's contention here, as the statute referred to provides:

"Every person, resident or nonresident, whether corporate or otherwise * * * employed in any kind of trade or business, shall be taxable for the same in the county where such person may reside, or have a place of business, or be temporarily located at the time of the assessment."

The local agency established in the state gave the seller a place of business or a temporary location within the state while a mere traveling salesman had neither. In the instant case, the Laurentide Company, Limited, had a place of business, several in fact, in the United States, and was temporarily located, and had and owned property which it was storing in the United States and delivering as its business contracts demanded.

In Flint v. Stone Tracy Co., 220 U. S. 107, 171, at page 172, 31 Sup. Ct. 342, at page 357, 55 L. Ed. 389, Ann. Cas. 1912B, 1312, where section 38 above quoted from was directly under consideration by the Supreme Court of the United States, that court said:

"It remains to consider whether these corporations are engaged in business. 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict. 158, citing People v. Commissioners of Taxes, 23 N. Y. 242, 244. 'That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' Bouvier's Law Dictionary, vol. 1, p. 273.

"We think it is clear that corporations organized for the purpose of doing business, and actually engaged in such activities as leasing property, collecting rents, managing office buildings, making investments of profits, or leasing ore lands and collecting royalties, managing wharves, dividing profits, and in some cases investing the surplus, are engaged in business within the meaning of this statute, and in the capacity necessary to make such organizations subject to the law.

"Of the Motor Taximeter Cab Company Case, No. 432, the company owns and leases taxicabs, and collects rents therefrom. We think it is also doing business within the meaning of the statute."

True, "doing business within the state," or "doing or transacting business in the United States," do not include the doing of a single act

or the making of a single contract, but do include a continued series of acts by an agent or agents continuously within the state or the United States, as the case may ·be. International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103. In that case it is held:

"The reasonable construction of a state statute relating to foreign corporations doing business within the state does not include the doing of a single act or the making of a single contract, but does include a continuous series of acts by an agent continuously within the state. Cooper Mfg. Co. v. Ferguson, 113 U. S. 727 [5 Sup. Ct. 739, 28 L. Ed. 1137].

"A foreign corporation engaged in teaching by correspondence, and which continuously has an agent in a state securing scholars and receiving and forwarding the money obtained from them, is doing business in the state; and such a corporation does business in Kansas within the meaning of section 1283 of the General Statutes of that state of 1901."

At pages 103 and 104 of 217 U. S., at page 483 of 30 Sup. Ct., 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103, the court said, as to "doing business":

"In view of the nature and extent of the business of the International Text-Book Company in Kansas, the first inquiry is whether the statutory prohibition against the maintaining of an action in a Kansas court by 'any corporation doing business in this (that) state' embraces the plaintiff corporation. It must be held, as the state court held, that it does; for it is conceded that the text-book company did not, before bringing this suit, make, deliver, and file with the secretary of state either the statement or certificate required by section 1283; and upon any reasonable interpretation of the statute that company, both at the date of the contract sued on, and when this action was brought, must be held as 'doing business' in Kansas. It had an agent in the state who was employed to secure scholars for the schools conducted by correspondence from Scranton, and to receive and forward any money obtained from such scholars. Its transactions in Kansas, by means of which it secured applications from numerous persons for scholarships, were not single or casual transactions, such as might be deemed incidental to its general business as a foreign corporation, but were parts of its regular business continuously conducted in many states for the benefit of its correspondence schools. While the Supreme Court of Kansas has distinctly held that the statute did not embrace single transactions that were only incidentally necessary to the business of a foreign corporation, it also adjudged that the business done by the text-book company in Kansas was not of that kind, ·but indicated a purpose to regularly transact its business from time to time in Kansas, and therefore it was to be regarded as doing business in that state within the meaning of the statute, and that it 'was the intention of the Legislature that the state should reach every continuous exercise of a foreign franchise,' and that it should apply even where the business of the foreign corporation was 'purely interstate commerce.' Deere v. Wyland, 69 Kan. 255, 257, 258 [76 Pac. 863, 2 Ann. Cas. 304]; State v. Book Co., 65 Kan. 847 [69 Pac. 563]; Commission Co. v. Haston, 68 Kan. 749 [75 Pac. 1028]. In our judgment, ·those rulings as to the scope of the statute were correct."

It is seen to be immaterial that in the case at bar the money collected was transmitted to the home office in Canada, or sent there in the first instance, or that the entire transactions, including the making and signing of the contracts, their execution or performance, and payment of moneys pursuant thereto, were not carried on from start to finish within the United States.

It seems to me clear that on the returns made the taxes were legally assessed, or imposed, and paid, and that the plaintiff is not entitled to recover in either case.

In Equitable Life Society v. Pennsylvania, 238 U. S. 143, 35 Sup. Ct. 829, 59 L. Ed. 1239, a Pennsylvania statute was under consideration, and the Pennsylvania court had held that the state could impose a tax on the business of a foreign insurance corporation doing business within the state, and that it was properly held that premiums on policies issued to persons in the state and paid directly to the home office measured the tax and did not amount to taxing property beyond the jurisdiction of the state. The court held that the relation of the foreign company to domestic policy holders constituted doing business within the meaning of the statute, for, as the Supreme Court said:

"It is obvious that many incidents of the contract are likely to be attended to in Pennsylvania, such as payment of dividends when received in cash, sending an adjuster into the state in case of dispute, or making proof of death."

There will be a judgment in each case dismissing the complaint on the merits, with costs.